## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FRANKLIN COUNTY BOARD OF EDUCATION,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC, FACEBOOK PAYMENTS, INC., META PAYMENTS INC., INSTAGRAM, LLC, SICULUS, INC., SNAP INC., TIKTOK INC., TIKTOK LLC, TIKTOK LTD, BYTEDANCE, INC., BYTEDANCE LTD, GOOGLE LLC, and YOUTUBE LLC.<br><br>Defendants. | Civil Action No. _____<br><br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Franklin County Board of Education brings this action against the following Defendant Social Media Companies and their affiliates and subsidiaries: Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta"), doing business as Facebook ("Facebook") and doing business as Instagram ("Instagram"), and its subsidiaries Facebook Holdings, LLC, Facebook Operations, LLC, Meta Payments, Inc., Facebook Payments, Inc., Instagram, LLC and Silicus, Inc., YouTube, LLC, Google LLC, Snap Inc., doing business as Snapchat ("Snapchat"), TikTok Inc., TikTok LLC, TikTok LTD, ByteDance LTD and ByteDance Inc. (collectively, "TikTok").

1

## I.  PARTIES

### A.  Plaintiff

1.      Plaintiff Franklin County Board of Education, a North Carolina body corporate as set forth in N.C.Gen.Stat. §115C-40, has general control and supervision of all matters concerning the schools within the Franklin County School District, which School District is located in Franklin County, North Carolina with an enrollment of about eight-thousand students.  Plaintiff Franklin County Board of Education as set forth in N.C.Gen.Stat. §115C-44 is empowered to institute all actions and suits for all monies due to schools in its School District.

### B.  Meta Defendants

2.      Defendant Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, California. Meta was incorporated in Delaware on July 29, 2004, as The Facebook, Inc. On September 20, 2005, the company changed its name to Facebook, Inc.  On October 28, 2021, the company assumed its current designation.

3.      Defendant Meta develops and maintains social media platforms, communication platforms, and electronic devices that are widely available to users throughout the United States. The platforms developed and maintained by Meta include Facebook (including its self-titled app, Marketplace, and Workplace), Messenger (including Messenger Kids), Instagram, and a line of electronic virtual reality devices and services called Meta Quest (collectively, "Meta platforms").

4.      Meta transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with its

2

subsidiaries (identified below), Meta has advertised, marketed, and distributed the Meta platforms to consumers throughout the United States. At all times material to this Complaint, Meta formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

5.    Defendant Meta's subsidiaries include Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments Inc.; Meta Platforms Technologies, LLC; Instagram, LLC; and Siculus, Inc.

6.    Defendant Facebook Holdings, LLC ("Facebook Holdings") was organized under the laws of the state of Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms, Inc. Facebook Holdings is primarily a holding company for entities involved in Meta's supporting and international endeavors, and its principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Facebook Holdings.

7.    Defendant Facebook Operations, LLC ("Facebook Operations") was organized under the laws of the state of Delaware on January 8, 2010, and is a wholly owned subsidiary of Meta Platforms, Inc. The principal place of business of Facebook Operations is in Menlo Park, California. Defendant Meta is the sole member of Facebook Operations.

8.    Defendant Meta Payments Inc. ("Meta Payments") is a wholly owned subsidiary of Meta Platforms, Inc. with its principal place of business in Menlo Park, California.  Meta Payments was incorporated in Florida on December 10, 2010, as Facebook Payments Inc. In July 2022, the entity's name was amended to Meta Payments Inc. Meta Payments manages, secures, and processes payments made through  Meta,

among other activities, and its principal place of business is in Menlo Park, California.

9. Defendant Instagram, LLC ("Instagram") was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2012, Meta purchased the company for approximately $1 billion. Meta reformed the limited liability company under the laws of the state of Delaware on April 7, 2012, and the company's principal place of business is in Menlo Park, California. Defendant Meta is the sole member of Instagram.

10. Defendant Siculus, Inc. ("Siculus") was incorporated in Delaware on October 19, 2011. Siculus is a wholly owned subsidiary of Meta, which supports Meta platforms by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, California.

### C. **Snap Defendant**

11. Defendant Snap Inc. ("Snap") is a Delaware corporation with its principal place of business in Santa Monica, California. Snap transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Snap has advertised, marketed, and distributed the Snapchat social media platform to consumers throughout the United States. At all times material to this Complaint, Snap formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

### D. **TikTok Defendants**

12. Defendant TikTok Inc. was incorporated in California on April 30, 2015, with its principal place of business in Culver City, California. TikTok Inc. transacts or has transacted business in this District and throughout the United States. At all times material

to this Complaint, acting alone or in concert with others, TikTok Inc. has advertised, marketed, and distributed the TikTok social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with ByteDance Inc., TikTok Inc. formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

13.    Defendant TikTok Ltd is a related corporate entity, which is headquartered at 8 Marina View, #43-00, Asia Square Tower 1, Singapore 018960 and upon information and belief is registered in the Cayman Islands at C/O Vistra (Cayman) Limited, P.O. Box 31119, Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, Cayman Islands JY1-1205.  This related corporate entity is listed on the Apple App store, Google Play Store and Microsoft Store.

14.    Defendant TikTok LLC is a related entity and is Delaware corporation with its principal place of business in Santa Monica, California.

15.    Defendant ByteDance Inc. ("ByteDance") is a Delaware corporation with its principal place of business in Mountain View, California. ByteDance transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, ByteDance has advertised, marketed, and distributed the TikTok social media platform to consumers throughout the United States.

16.    Defendant ByteDance Ltd. is a multinational internet technology holding company and is the parent company of TikTok, Inc., TikTok Ltd., and ByteDance, Inc. ByteDance Ltd. is headquartered in Room 503 5F, Building 2, 43 North Third Ring West Road, Beijing, 100086 China and registered in the Cayman Islands at C/O Vistra

(Cayman) Limited, P.O. Box 31119, Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, Cayman Islands JY1-1205. ByteDance Ltd. is a Chinese corporation with its principal place of business in Beijing, China and it designs, owns, and/or operates the TikTok social media platform, an application that is widely marketed by TikTok and available to minors throughout the United States.

17.     At all times material to this Complaint, acting alone or in concert with TikTok Inc., TikTok LLC and TikTok Ltd., ByteDance and/or ByteDance Ltd. formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

18.     Defendants TikTok, Inc., TikTok LLC, TikTok Ltd., ByteDance, Inc. and ByteDance Ltd. are collectively referred to as "TikTok".

### E.     <u>YouTube Defendants</u>

19.     Defendant Google is a limited liability company organized under the laws of the state of Delaware, and its principal place of business is in Mountain View, California. Google is a wholly owned subsidiary of XXVI Holdings Inc., and the managing member of YouTube, LLC. Google transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Google has advertised, marketed, and distributed its YouTube video sharing platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with YouTube, LLC, Google formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

20.     Defendant YouTube, LLC is a limited liability company organized under the laws of the state of Delaware, and its principal place of business is in San Bruno,

California. YouTube, LLC is a wholly owned subsidiary of Google. YouTube, LLC transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with Defendant Google, YouTube, LLC has advertised, marketed, and distributed its YouTube social media platform to consumers throughout the United States. At all times material to this Complaint, acting alone or in concert with Google, YouTube, LLC formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

## II.     JURISDICTION AND VENUE

21. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00, and Plaintiff and Defendants are residents and citizens of different states.

22. The Court has personal jurisdiction over Defendants because they do business in the Eastern District of North Carolina and have sufficient minimum contacts with the District. Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, and operations of their platforms at issue in this lawsuit in North Carolina and by retaining the profits and proceeds from these activities, to render the exercise of jurisdiction by this Court permissible under North Carolina law and the United States Constitution.

23. Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

7

## III. FACTUAL BACKGROUND

### A. Facebook

24. Facebook was founded in 2004, and now hardly bares any resemblance to what it originally was. Originally to join Facebook users had to verify they were a student at one of a select few colleges.

25. In 2005, Facebook extended access to students at twenty-one universities in the United Kingdom and others around the world. When discussing their release of a high school version of Facebook, Meta CEO and majority shareholder, Mark Zuckerberg, referred to it as the next logical step. At that time, an invitation was required to join.

26. In September of 2006 Facebook opened membership to anyone interested in joining provided they were over 13 years old and had a valid email address. On information and belief, Facebook made the decision to no longer require verification of age and/or identity and did not actually verify user email address, such that underage users could enter made up email addresses and be granted access to a Facebook account.

27. As evidenced by Meta's enforcement and verification of membership requirements, it had the knowledge and capability to effectively limit access to its platform.

28. Multiple former Facebook executives have acknowledged that decisions made by Facebook to increase user engagement were made with the knowledge that the mental health of its users would be negatively impacted.

29. The acknowledgements of former executives stand in stark contrast with Meta's public statements about the safety of its platforms. Facebook founder and CEO, Mark Zuckerberg, has repeatedly claimed that safety was Meta's (then Facebook) top

8

priority.

30. Despite unambiguous legal mandates that it could not allow children under 13 years old to join, Meta actively targeted advertising to children under 13. Meta leadership, including Mr. Zuckerberg, actively rejected re-designs intended to reduce potential harm to child and teen users, like the youth attending Plaintiff.

31. The mental health and wellbeing of young users are negatively impacted by many facets of Meta's platforms. Multiple features and design components, turn social interaction on Facebook into a competition that is particularly harmful to young users. Meta uses Algorithmic data mining to pair users with content which will maximize engagement with Meta's platforms. Countless other aspects of Meta's platforms further youth mental harms.

32. Meta leadership, including Mark Zuckerberg, have repeatedly delayed, refused, or ignored internal and external calls to make changes to better protect users from potential harms in favor of furthering their and Meta's financial interest.

33. Meta is aware that there is content that is, at the bare minimum, not appropriate for children on its network. Meta is further aware that its own algorithm directs users, including children and teens, to view this content.

34. Recent internal Meta studies have recognized that design features Meta purposely embedded in its platforms cause intense mental harm to young people. Rather than remedy these issues Meta maintains the features to continue to drive user engagement.

35. Meta has the capability to implement safety measures to better protect children and teenage users but consistently chooses to maximize profits over protecting

vulnerable users.

36.     In addition to pushing users towards harmful content to increase user engagement, the default settings for Meta's Messenger also permit and encourage harm to "vulnerable" users. Meta's default settings allow bad actors with unfettered access to minors. Meta is again aware of the problem but remains inactive so as to not hurt their bottom line.

37.     Meta's utilizes push notifications across its platforms to increase user engagement and drive profits. Using data collected about the user and the user's friends, Meta sends notifications specifically tailored in frequency and content to prompt users to open their apps more frequently and engage with them for longer periods of time.

38.     Facebook encourages young users to post more frequently by obtaining publishing rights to popular music, creating GIFs, filters, stickers and allowing users to utilize them when they publish posts. By providing these pieces of content for users to build their posts with Facebook is acting as a co-producer of the user's posts. The decision to offer access to such content is made to increase user engagement to increase profits.

39.     Meta accepts the potential harm caused by their policies and lacks reforms because it directly profits from the time and attention spent by young users on its platforms both directly through paid transactions and indirectly by way of data collected.

40.     Facebook whistleblower, Frances Haugen, made clear that company executives know the impact of their decisions stating, "The company's leadership knows ways to make Facebook and Instagram safer and won't make the necessary changes because they have put their immense profits before people."[1] Haugen continued, "[Facebook's] profit

---

[1] Frances Haugen, Statement before United States Senate Committee on Commerce, Science and Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security (Oct. 4, 2021), available at

optimizing machine is generating self-harm and self-hate — especially for vulnerable groups, like teenage girls. These problems have been confirmed repeatedly by Facebook's own internal research."[2] As emphasized by Haugen, "Facebook became a $1 trillion company by *paying for its profits with our safety, including the safety of our children*."[3] Haugen's explosive testimony and documentary evidence have unfortunately not changed this conduct.

41.     Millions of teen and child users, including the students of Plaintiff, use Meta's inherently and intentionally dangerous social media platform every single day.

**B.     <u>Instagram</u>**

42.     At its launch in 2010 Instagram was a photo-sharing app built for mobile devices. Facebook acquired Instagram in 2012 for $ 1 billion dollars. Upon acquisition Meta instituted policies to greatly increase utilization of Instagram. Many of these policies bore harmful side effects for users, particularly young users like students of Plaintiff.

43.     Instagram offers many of the same features that Facebook does, which have potentially negative consequences. The harm caused by these features and policies are either known or easily foreseeable.

44.     Meta's platforms funnel content to users with the intent of increasing the number of interactions without consideration for the quality of the interaction. In doing so Meta is choosing user engagement over the health and wellbeing of its users. Meta's prioritization of engagement and profit leaves creates a platform which is inherently dangerous and defective for teen and child users.

---

https://www.commerce.senate.gov/services/files/FC8A558E-824E-4914-BEDB-3A7B1190BD49
[2] *Id.*
[3] *Id.* (emphasis in original).

45.     Instagram, like Facebook, utilizes a "feed" that users see when interacting with the app. The feed is comprised of posts of people the user follows and, importantly, content promoted by Meta's algorithm and paid advertisements. As such the user does not have full control of what content is included in their "feed."

46.     Meta determines what to include in a user's "feed" based on what it believes will increase user engagement. The control Meta has in determining what a user sees can and does cause teen users to be repeatedly and knowingly shown harmful and unhealthy content.

47.     In addition to the user's "feed" Instagram offers an "Explore" feature which provides endless content promulgated not by the user's choices but by the application's algorithm and paid advertisers targeting the user based on data collected by Meta about the user. Because the user does not have control over the content featured in the "Explore" feature, it is a hotbed of harmful and unhealthy content. Meta is aware of the heightened dangers for teens and young users associated with the "Explore" feature:



Instagram, *Teen Girls Body Image and Social Comparison on Instagram—An Exploratory Study in the U.S.*, available at https://s.wsj.net/public/resources/documents/teen-girls-body-image-and-social-comparison-on-instagram.pdf, at 31.

48.     Meta chooses to promote content which it knows is harmful and or unhealthy for teens and young users but has time and again refused to implement changes known to mitigate potential harm. The decision to maintain the status quo is based on a desire to drive user engagement and reap increased profits.

49.     Internal documents make clear that Meta is aware of the extreme impact it has on teen users. Specifically, Meta is aware of surveys which show Instagram drives negative feelings, including depression, suicidal ideation, or violence to others, and how teens themselves categorize the harms Instagram causes:[4]



[4] Instagram, *Teen Mental Health Deep Dive,* available at
https://s.wsj.net/public/resources/documents/teen-mental-health-deep-dive.pdf





*See, supra,* "Teen Mental Health Deep Dive," p. 18, 27, 32 (examples only).

50.     "Reels" and "Stories" are features which promote the use of short videos and temporary posts, respectively. These features were developed to appeal to and targeted at teen and child users. Meta is aware that "Reels" and "Stories" create an environment which is both addictive and harmful to the target audience:





*See, supra, Teen Girls Body Image and Social Comparison on Instagram*, at 33-34.

51.     Instagram profiles can be "public" or "private" and who can view a user's profile is dependent on the selection. Meta now claims that certain categories of users are defaulted to private in order to protect the users. However, even users in those specific categories can change their profile to public through the application's settings. When a profile is "public" Instagram allows any and all users to interact with and request follows from underage users. Instagram has the tools and capabilities to implement policies to better protect teen and child users but chooses not to in favor of user engagement and profit margins.

52.     There is no functional purpose in allowing underage users to have "public" profiles. Rather, doing so increases user engagement through increased interactions at the time of account activation. Defendants are aware that many of these interactions are harmful and or dangerous and have opted for inaction despite having the ability to better protect vulnerable users.

53.     Harmful and dangerous interactions can and do occur via Instagram's Direct messaging feature because Meta's default settings provide potential predators and other bad actors with a direct unsupervised line to teens and adolescent users.

54.     Avoiding unwanted interactions is made difficult by policies implemented by Instagram including allowing users to maintain multiple accounts, and lackluster methods of verifying identifying information about users. Instagram does not currently have any effective policies or features stopping a given person from opening hundreds of accounts using fictitious identifying information. Combined with other features meant to drive interactions and user engagement the ability of predators and other bad actors to create accounts using unverified information creates fertile grounds for numerous

16

negative mental health impacts.

55. The usage of push and email notifications create an addictive environment designed to increase user engagement and utilization of the platform. Meta, through Instagram, sends notifications based on data collected about the individual user as well as data collected about the individual's friends and contacts. The notification system implemented by Instagram is intended to encourage the user to open the application more frequently and engage with the selected content and paid advertisements for longer periods of time. Despite knowing the risks and harms to users associated with over utilization Meta has refined the timing and content of notifications to maximize engagement.

56. While appealing to students, features incorporated into Instagram including "likes", filters, and emojis, also increase social comparison pressure and resulting harm. Despite knowledge that many of these features have a particularly negative impact on teenage girls Meta has regularly rejected policy and feature changes that would mitigate the features' impact in favor of user engagement and profit.

57. Instagram encourages young users to post more frequently by obtaining publishing rights to popular music, creating GIFs, filters, stickers and allowing users to utilize them when publishing posts. By providing these pieces of content for users to build their posts with, Instagram is acting as a co-producer of the user's posts. The decision to offer access to such content is made to increase user engagement to increase profits.

58. Despite knowledge that policies and features of Instagram harms teens and adolescent users, Executives regularly and routinely put user engagement and profits over the health and wellbeing of teen and adolescent users.

59. Meta is aware that millions of underage children, including Plaintiff's

students, actively use its platforms on a daily basis. Instead of implementing policies and procedures to better protect underage users, Meta had intentionally built ways of evading the watchful eye of parent and other authority figures including allowing users to create multiple accounts, failing to verify age and identity of users, and not providing easily ascertainable points of contact for parents to voice concerns about accounts created without consent among others. Additionally, Meta continues to advertise and market its products to underage children.

### C. **YouTube**

60.     YouTube is a video sharing and social media platform based in San Bruno California. A 2022 Pew Research Center Survey found that 95% of American teens use YouTube and that 20% report using YouTube almost constantly.[5]

61.     YouTube's revenue is largely advertiser based. YouTube uses data collected about its users to embed targeted ads before, during, and after videos played for the user.[6]

62.     When content creators garner enough viewers, YouTube offers them the opportunity to enter a partnership to monetize their channel by way of delivery of targeted advertisements to their viewers. YouTube then offers content providers systems and features to incentivize the posting of additional monetized content.

63.     Advertising on YouTube channels is based on context or behavior. Context based advertising does not track the specific viewer but instead offers advertisements based on the channel or specific video being viewed. Behavioral advertising utilizes user

---

[5] Pew Research Center, Teens, Social Media and Technology 2022,
https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.
[6] Andrew Beattie, *How YouTube Makes Money Off Videos*, Investopedia, Oct. 31, 2021,
https://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp

specific data to target ads more tightly to the specific user. Content creators are allowed to choose which type of advertising is used on their channel, but the two types do not provide equal payouts, with behavioral advertising offering more significant payouts. As such YouTube creates a financial incentive for content creators to opt for behavioral advertising.

64.     In recent years YouTube has seen significant growth in advertising revenues.

65.     YouTube utilizes multiple features and methods to drive compulsive and addictive usage by minor children into "rabbit hole" experiences including automatically playing the next video when the user's initial video finishes playing. Such features and methods also drive ad revenue for YouTube.

66.     YouTube uses proprietary algorithms to funnel content to users using formulas YouTube refused to disclose. In a 2021 post on YouTube's official blog, Cristos Goodrow, VP of Engineering at YouTube, described the algorithm in general terms as follows,

> [P]roviding more transparency isn't as simple as listing a formula for recommendations, but involves understanding all the data that feeds into our system. A number of signals build on each other to help inform our system about what you find satisfying: clicks, watchtime, survey responses, sharing, likes, and dislikes.[7]

67.     While refusing to make information available about how their algorithm works YouTube executives have been notified by employees that its systems and policies promote and amplify violent and harmful content. Rather than address these known, and

---

[7] Cristos Goodrow, *On YouTube's recommendation system*, Inside YouTube, Sept. 15, 2021, https://blog.youtube/inside-youtube/on-youtubes-recommendation-system/.

easily foreseeable dangers executives prioritize engagement and revenue.

68.     Company insiders have said that engagement is the primary goal within the company and that corporate leadership is either unable or unwilling to act to mitigate the dangers within their system for fear of throttling engagement.[8]

69.     YouTube knows the more people watch, the more ads it can run, and that suggesting what to watch next is the best way to keep users watching. In 2012, YouTube was run by Google veteran Salar Kamangar, who set an objective to reach one billion hours of viewing a day and retooled its systems to meet that goal.[9]

70.     In its effort to reach the one billion hours a day mark YouTube found that outrage equals attention. YouTube implemented changes to maximize addiction while continuing to utilize an algorithm which favored user engagement over the safety and wellbeing of its users including teens and adolescents.

71.     The secret-algorithm driven engagement is by YouTube's own admission responsible for 70 percent of views on the site.[10]

72.     The end result of YouTube's policies, systems, and practices is the majority users, like Plaintiff's students, are told what they should watch next by an algorithm designed to keep eyes on the screen by delivering addictive, harmful, and often times violent content they would not otherwise have seen.

73.     YouTube, like some other named Defendants, relies on its algorithm to decide what content gets suggested for individual users based on data it has collected.

---

[8] Mark Bergen, *YouTube Executives Ignored Warnings, Letting Toxic Videos Run Rampant*, Bloomberg, (Apr. 2, 2019), *available at* https://www.bloomberg.com/news/features/2019-04-02/youtube-executives-ignored-warnings-letting-toxic-videos-run-rampant.
[9] *Id.*
[10] Max Fisher & Amanda Taub, *On YouTube's Digital Playground, an Open Gate for Pedophiles*, N.Y. Times, (June 3, 2019), *available at* https://www.nytimes.com/2019/06/03/world/americas/youtube-pedophiles.html.

YouTube controls the URLs for the content and pushes lists of URLs directly to users encouraging them to watch the selected content. YouTube is aware that content it pushes to children and teens, like Plaintiff's students, is harmful.

74. YouTube knows underage children are active on its platform and rather than take steps to ensure the safety of young users it has taken steps specifically designed to evade parental consent.

75. Millions of teenage and adolescent users, including Plaintiff's students, have become addicted to YouTube, using it every day. These children suffer significant mental harms resulting from the design, features, and operation decisions made by YouTube parent Alphabet.

**D.** **Snapchat**

76. Snapchat was founded in 2011 and is headquartered in Santa Monica, California. Snapchat is a one of the most widely used social media platforms in existence and is especially popular with teenagers.[11]

77. Since its inception Snapchat offered users the ability to share "Snaps" (photos or short videos). A distinguishing feature is "Snaps" will automatically disappear after being viewed by recipients. Company leadership instituted design changes and developed new features including, but not limited to, live video, filters, and the ability to accept payment through the app for the purpose of increasing user engagement and further establishing Snapchat as a social media platform of choice among teenage and adolescent users.

---

[11] Emily A. Vogels, Risa Gelles-Watnick, Navid Massarat, *Teens, Social Media and Technology 2022,* Pew Research Center (Aug. 10, 2022), available at https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.

78.     Snapchat, like other named defendants, monetized its user base and in 2018 almost 100% of Snapchats revenue was advertising based. In an effort to further generate revenue based on user data, Snapchat implemented policies and features which drove user engagement and profits at the cost of user safety.

79.     Snapchat currently has almost 100 million users in the United States of which the company estimates at least 17 million are under the age of 18.

80.     Snapchat uses algorithms and/or similar technologies to send users messages suggesting they add some other user as a "friend." These company suggested connections are directly responsible for harmful unwanted contacts with predators and other bad actors which otherwise would not be made. The singular purpose of these suggested connections is to drive user engagement.

81.     Snapchat users also have an "Explore" feed which functions in a similar way to the Instagram "Explore" feed. The "Explore" like other features the purpose of the "Explore" feed is to drive up user engagement and has been described by many people as being "dangerously addictive."

82.     Snapchat's defining feature, as previously mentioned, is the automatic deletion of content. The automatic deletion of content is particularly dangerous to minors as it encourages the exchange sexually explicit, and inherently illegal images with predators, provides means of recruitment for predators, and makes parental monitoring of content extremely difficult.

83.     Reports of the platform's features being used to bully and abuse children

have plagued Snapchat for years.[12] Despite knowledge of the problems associated with its features, Snapchat has chosen to leave the problematic features in place to avoid impacting the popularity of the platform among its users. As a result, predators and other bad actors continue to utilize Snapchat to gain unfettered access to teens and adolescents.

84. Despite being advertised as automatically deleting, there are many ways for recipients to save received "Snaps". Many teen and adolescent users rely on Snapchat's representation that their content will disappear but later learn that "Snaps" they believed would be temporary have become permanent. "Snaps" outliving their intended lives have led to bullying, and sexual exploitation and abuse of teenage and adolescent users, like Plaintiff's students. Snapchat is aware of the potential and actual harm caused by and on its platform.

85. Almost ten years ago Snapchat implemented their "Stories" and "Chat" features which allowed for longer posts, viewable by users outside of the poster's friend group. Similar to Meta's algorithms, Snapchat's policies, and platform design drives user engagement through the promotion of potentially harmful content.

86. Snapchat has allowed, at all relevant times, any user regardless of age to share their physical location on a feature called "Snap Map." "Snap Map" not only allows a user's follower to see their location but also complete strangers, including potential predators and other bad actors, to also see the location of users posting public "Snaps." Snapchat is aware that "Snap Map" has directly contributed to cases of stalking, and

---

[12] Zak Doffman, *Snapchat Has Become A 'Haven for Child Abuse' with its 'Self-Destructing Messages'*, Forbes (May 26, 2019), available at https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/.

physical attacks on minor users.

87.     Snapchat has the knowledge and capability to better protect its teen and adolescent users. Snapchat has developed an artificial intelligence program which can detect would be predators who send sexually explicit content to and receive sexually explicit and potentially illegal content from teen and adolescent users. As such, Snapchat has actual knowledge that many of its underage users are not only solicited for but actually provide self-created sexually explicit content to adults in violation of 18 U.S.C. § 1591(a)(1)-(2). Despite this knowledge, in many instances Snapchat fails to take steps to better protect its underage users.

88.     Far from taking steps to better protect teenage and adolescent users Snapchat offers a feature known as "My Eyes Only." "My Eyes Only" allows the user to store content in a folder which cannot be accessed by anyone, including Snapchat, without entry of a passcode set by the user. The only purpose of the "My Eyes Only" feature is to allow users to hide content that is either sexually explicit or otherwise harmful from parents and/or legal guardians. Because Snapchat itself cannot access the saved content, the feature further acts to effectively bury evidence of misconduct.

89.     Based on information and belief, Snapchat's "disappearing" feature is also defective for this reason. Snapchat retains possession, custody, or control of the data, knows of its potential relevance in litigation, but has purposefully designed and promoted its platform to imply that the data is no longer accessible to anyone, even Snapchat itself, frustrating efforts by parents and/or legal guardians to monitor the activity of underage children on the platform. There is no reason Snapchat should not be required to remedy these defects immediately.

90.     Like other named defendants, Snapchat utilizes push and email notifications in an effort to drive user engagement by promoting addictive behaviors. Snapchat uses data collected about individual users to determine when and how often these notifications are sent out to best drive-up user engagement. The purpose of the notifications is to prompt the user to open the application and engage with selected content more frequently and for longer periods of time without regard for the health and wellbeing of the user.

91.     To further optimize user engagement, Snapchat provides inducements for increased posting by users. Trophies, streaks, and other inducements are viewable by other users and act as a form of displaying social status. These features are devoid of any purpose beyond driving user engagement and utilization. Specific names and metrics have been changed over the years but regardless of name Snapchat continues to offer social status as an inducement to maximize individual user's engagement regardless of harmful side effects.

92.     While offering no tangible benefit, these features do have very real and very harmful impacts on the lives of teenage and adolescent users, like Plaintiff's students, including, but not limited to, increased levels of anxiety, depression, sleep deprivation, bullying, and other harms to the physical and mental health.

93.     Snapchat utilizes features discussed above, and others, with no functional purpose than it knows are particularly appealing to young users to addict teenage and adolescent users.

94.     Snapchat has developed stickers, filters, avatars, emojis, and sounds for users to add to their posts. Additionally, Snapchat has retained the publication rights to

music, sounds, and videos that users can integrate into their posts.

95.     The images, stickers, filters, avatars, emojis, sounds and video supplied by Snapchat are regularly the only content in a user's post and as such are a material contribution by Snapchat to the post. When users utilize the content made available by Snapchat in their individual posts, Snapchat itself becomes a co-publisher of the user's content. The utilization of content made available by Snapchat can exacerbate the harm caused to teenage and adolescent users like Plaintiff's students.

      **E.**    **TikTok**

96.     TikTok is a social media application which allows individual users to create and share videos and photos. TikTok is the international version of a Chinese social media application called Douyin. TikTok became available worldwide after merging with another Chinese social media application, Musical.ly in August of 2018.

97.     TikTok became wildly popular across the world during the Covid-19 pandemic. Until 2021 all TikTok user profiles defaulted to being public regardless of the age of the user.

98.     As soon as a user opens the application, they are dropped into an endless stream of videos created by other users and advertisers called the "For You Page." TikTok utilizes an algorithm which utilizes data collected about the user to determine what appears on an individual's "For You Page."

99.     Like other named Defendants TikTok uses its algorithm to increase user engagement by addicting users to the platform. TikTok's algorithm induces users to spend as much time as possible on the application by using analytics to tailor the content shown to the user's previous interactions with the application and selected areas of interest.

26

100. TikTok has stated that its algorithm has four main goals "user value," "long-term user value," "creator value," and "platform value."

101. An internal TikTok document titled "TikTok Algo 101"[13] explains that in the interest of achieving the company's "ultimate goal" of adding daily active users, the company has optimized two metrics in determining which videos it puts on a user's "For You Page": retention, and time spent. Retention looks at whether a user comes back while time spent refers to the amount of time the user spends engaging with each clip.

102. The Wall Street Journal recently reported on TikTok's reliance on the amount of time a user spends watching an individual video to direct them towards similar videos in order to keep the user on the app for longer periods of time. This process can have significant impacts on teenage and adolescent viewers by funneling them towards content which increases incidents of self-harm and suicidal ideation.

103. In explaining that TikTok markets itself as an artificial intelligence company, a New York Times article stated "It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, no matter what you actually say you want to watch … Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok."[14] Another article by the New

---

[13] Ben Smith, *How TikTok Reads Your Mind*, New York Times (Dec. 5, 2021), available at https://www.nytimes.com/2021/12/05/business/media/tiktok-algorithm.html

[14] John Herrman, *How TikTok is Rewriting the World,* New York Times (Mar. 10, 2019), available at https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html.

York Times confirms, "Every swipe, tap and video viewed by TikTok users around the world — billions and billions of data points a day — is fed into giant databases, which are then used to train artificial intelligence to predict which videos will keep users' attention."[15]

104. In addition to funny choreographed dances, TikTok features and promotes various "challenges" where users film themselves engaging in behavior copying and often "one upping" other users, often resulting in users engaging in perilous conduct. Hashtags associated with given challenges are then promoted within the application's search feature. "Challenges" are widely viewed and TikTok benefits financially from them.

105. TikTok, like other named Defendants, has developed or uses artificial intelligence programs to identify adult users that send, receive, or request sexually explicit content from underage children. TikTok has actual knowledge that large numbers of its underage users, like Plaintiff's students, regularly receive and fulfill requests for explicit pictures of themselves in violation of 18 U.S.C. § 1591(a)(1)–(2). Despite having the capability to utilize available technology to better protect its underage users TikTok seldom acts, allowing untold harm to occur on its platform.

106. Like other named Defendants, TikTok utilizes push and email notifications in an effort to drive user engagement by promoting addictive behaviors. TikTok uses data collected about individual users and their peers to determine when and how often these notifications are sent out to best drive-up user engagement. The purpose of the notifications is to prompt the user to open the application and engage with selected

---

[15] Kevin Roose, *Is TikTok a Good Buy? It Depends on What's Included*, New York Times (Aug. 5, 2020), available at https://www.nytimes.com/2020/08/05/technology/tiktok-deal-algorithm.html.

content more frequently and for longer periods of time without regard for the health and wellbeing of the user for the financial benefit of TikTok.

107.     TikTok has a significant user base under the age of 18. TikTok claims to have a minimum age requirement of 13-years-old but takes few if any meaningful steps to verify the age of users.

108.     By TikTok's own account a significant portion of its daily users are 14-year-olds or younger. TikTok has actual knowledge that many of those users are well below their minimum age requirement. Despite this knowledge TikTok regularly does not take any action to suspend the account, verify age, or contact parents and/or legal guardians of the users in question.

109.     TikTok takes limited or no action to verify the age of users, fails to require parental consent when a minor joins, and does not offer adequate parental controls to assist in limiting usage.

110.     Leaked internal documents reflect that TikTok is aware that the company itself does not know the age of a significant portion of its daily users.[16]

111.     TikTok, like other named Defendants, is primarily concerned with maximizing user engagement and time spent on the platform and has implemented features targeted at teenage and adolescent users to keep them on the platform.

112.     TikTok has developed stickers, filters, avatars, emojis, and sounds for users to add to their posts. Additionally, TikTok has retained the publication rights to

---

[16] Raymond Zhong, Sheera Frankel, *A Third of TikTok's U.S. Users May Be 14 or Under, Raising Safety Questions*, New York Times (Aug 14. 2020), available at https://www.nytimes.com/2020/08/14/technology/tiktok-underage-users-ftc.html.

music, sounds, and videos that users can integrate into their posts.

113.    The images, stickers, filters, avatars, emojis, sounds and video supplied by TikTok are regularly the only content in a user's post and as such are a material contribution by TikTok to the post. When users utilize the content made available by TikTok in their individual posts, TikTok itself becomes a co-publisher of the user's content. The utilization of content made available by TikTok can exacerbate the harm caused to teenage and adolescent users like Plaintiff's students.

114.    TikTok continues to put profits over the mental and physical wellbeing of its millions of underage users which it knows are harmed by its dangerous and defective platform.

115.    TikTok knows there are ways of better protecting vulnerable users but chooses not to implement those protections.

116.    TikTok has shown a conscious disregard of any duty to protect its teenage and adolescent users, including Plaintiff's students.

IV.    **TO INCREASE REVENUES DEFENDANTS MAXIMIZED USER ENGAGEMENT AT COST OF USERS' MENTAL HEALTH**

117.    All named Defendants offer their applications for free to download through application stores for various mobile devices, and do not charge users for accessing their platforms. Defendants are able to offer their services to the users for free because they are able to generate significant advertising revenue by collecting data about its users to allow advertisers to target their advertisements more narrowly.

118.    Defendants are able to collect more advertising revenue the longer users stay on the platform. This creates an incentive for Defendants to keep users engaged on

their platforms by any means necessary.

119.    Defendants intentionally design their platforms to entice users into spending ever increasing amounts of time on their platforms. Defendants know or should know they have created platforms which cause their underage users to become addicted and reliant on using their platforms. Additionally, Defendants intentionally add features which reinforce the users' addiction by offering intermittent reinforcement for desired behaviors.

120.    Industry insiders suggest that Defendants have sought out ways to maximize the addictiveness of their applications. Many Defendants offer a "pull to refresh" function on feed which is based on the operation of slot machines. The feature creates an endless stream of new content which prevents users from reaching an end point that would naturally notify users it was time to do something else.[17]

121.    Defendants actively conceal the addictive nature of their platforms. Defendants regularly attempt to publicly diminish the harm their platforms have on teenage and adolescent users by refusing to release internal findings and making false or intentionally misleading statements.

122.    Despite mounting evidence to the contrary, Defendants almost uniformly take the position that their platforms are both safe and non-addictive for users including teens and adolescents.

123.    Defendants regularly add features which do not increase the functionality

---

[17] Daniel Kruger, Ph.D., M.S., *Social Media Copies Gambling Method 'to create psychological cravings'*, University of Michigan Institute for Healthcare Policy & Innovation (May 8, 2018), available at https://ihpi.umich.edu/news/social-media-copies- gambling-methods-create-psychological-cravings.

of their applications but instead encourage users to stay engaged on the applications more often and for longer periods of time. The FTC has recently said these features are designed to manipulate unknowing users into staying on the given application and also steer the user towards desirable usage.[18] Defendants know these features are unreasonably harmful to the developing minds of teenage and adolescent users like Plaintiff's students.

124.    Bottomless scrolling, push and email notifications, and live videos are some examples of the features Defendants have used to entice users to open their applications more frequently and stay engaged on the application for longer periods of time.

125.    Defendants spend exorbitant sums of money marketing their platforms to teenage and adolescent users because they are willing to endanger those same users to increase their revenues.

## V.    ADDICTING TEEN USERS WAS INTENTIONAL

126.    Defendants all use complex data analytics, artificial intelligence, and algorithms to create features intended to maximize time users spend on their apps.

127.    Defendants' applications select content for teenage and adolescent users to familiarize and ingratiate those users to the application. Defendants do not offer a neutral hand in which content they promote rather promoting content which is designed to maximize user engagement.

128.    Defendants regularly make changes to their applications to increase usage

---

[18] FTC Staff Report, *Bringing Dark Patterns to Light*, FTC Bureau of Consumer Protection (September 2022), available at
https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-
FINAL.pdf

they know is addictive and harmful to teen and adolescent users like Plaintiff's students.

129. In order to drive advertisement revenue, Defendants YouTube, Facebook, Instagram, and TikTok utilize, through different features, endless feeds of content. These types of feeds disrupt brain chemistry and rob users of normal indicators that it is time to move to a new activity. Defendants know these types of endless feeds are harmful to the mental health and wellbeing of their users.

130. Defendants know that the most harmful content is also the highest drivers of user engagement. Taking that into account, Defendants' algorithm regularly pushes that content to users that but for Defendants' actions would never see such content.

131. Defendants regularly take steps to hide the addictive nature of their platforms by avoiding calls for transparency, obscuring the nature of advertisements, and making demonstrably misleading or flat-out false statements about measures taken to guarantee user safety.

132. The algorithms of Meta, YouTube, and TikTok fill users' feeds with increasingly harmful, destructive, and potentially abusive content in order to keep users, like Plaintiff's students, on its platform at the expense of the users' safety and wellbeing.

133. Rather than directing teenage and adolescent users to content based on their individual viewing histories, an option that is available and feasible, Defendants recommend content based on information they have gathered beyond what users knowingly furnish. Defendants utilize data collected from a myriad of sources about similar users to offer content they know will maximize user engagement.

134. Defendants do not care what kind of content their algorithms utilize to addict a given user as long as the end result is increased user engagement.

## VI.     MINOR USERS FACED MULTIPLE HARMS

### A.     Social Media Usage Continues to Increase

135.     The mental health crisis caused by Defendants actions began before the Covid-19 pandemic but became more significant as the amount of screen time teenagers and adolescents increased as schools and other activities closed for in person interactions.

136.     By 2021 American teenagers were averaging 8 hours and 39 minutes of daily usage.[19] This represents a dramatic increase in usage from previous years.

137.     In 2022 over half of teens reported it would be difficult for them to give up social media.[20]

138.     In a never-ending cycle of Defendants trying to increase user engagement on their platform, Defendants regularly introduce features borrowed from other Defendants when they are shown to drive engagement.

139.     Even as the average daily screen time has increased, American teens have reported a decrease of enjoyment from social media engagement.[21]

### B.     Developing Brains Are More Susceptible to Manipulation

140.     Naturally the brains of adolescents and teenagers are not fully developed. Adolescents and teenagers have not fully developed the ability to evaluate risk, or control emotions and impulses.

141.     Studies have shown that the prefrontal cortex is one of the last areas of the

---

[19] *The Common Sense Census: Media Use by Tweens and Teens*, Common Sense (2021), available at https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.
[20] Emily A. Vogels, Risa Gelles-Watnick, and Navid Massarat, *Teens, Social Media and Technology 2022,* Pew Research Center (Aug. 10, 2022), available at https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022/.
[21] *See* 2021 The Common Sense Census at Table D.

brain to develop. The prefrontal cortex plays a significant role in high-level cognitive functioning, evaluation of potential consequences, and determining if a potential reward outweighs the risks.

142.     Throughout childhood and adolescence, the brain continues to mature. As the child ages the brain continues to develop structures to assist with decision making, risk evaluation, and impulse control as well as increasing the efficiency of neural pathways used to make these determinations and decisions. It is believed that the brain continues to develop and refine these processes well into the twenties.

143.     Defendants build their platforms to intentionally exploit the still developing brains of adolescent and teenage users like Plaintiff's students. Defendants prey on the diminished ability of adolescent and teenage users to control emotions and impulses, and to correctly assess risks. Further Defendants know or should know adolescents and teenage users experience interactions on their platforms differently than adult users do, and as such are more likely to have stronger emotional reactions, act impulsively, and exercise overall poor judgement with regard to their social media activity. Defendants know, or should know that because their brains are still developing adolescent and teenage users are at a greater risk of suffering serious physical and psychological harm caused by their interactions on social media platforms. Knowing all this, Defendants continue to put user engagement and revenues over implementation of features that would better protect its underage users.

C.     **Defendants Role in Mental Health Crisis**

144.     In 2018 a survey of U.S. teens found that one in six teenagers experienced some form of abusive material online. Over 60% identified online harassment as a "major

problem" facing teenagers.[22]

145. The U.S. Surgeon General has spoken out about social media platforms, including the Defendants', and said they can be a threat to the health and wellbeing of the country's youth.[23]

146. A 2022 survey indicates that incidents of cyber bullying are on the decline from previous years.[24] Even so the mental health crisis facing teen and adolescent users deepens. This indicates that mental health issues stemming from social media actions are not only attributable to other users.

147. Perhaps the most significant indicator of the growing mental health crisis facing teenagers today is the dramatic increase in teens and adolescents who have thought about, attempted, or committed suicide. The U.S. Surgeon General has reported that in roughly ten years there have been increases of as much as 57% in each of these categories.[25]

148. Recent studies have indicated that many feelings of isolation, and hopelessness are experienced by adolescent and teenage users of Defendants' social media platforms.[26] Defendants' platforms are uniquely susceptible to causing or increasing behaviors like feedback-seeking and negative social comparisons.[27]

---

[22] Monica Anderson, *A Majority of Teens Have Experience Some Form of Cyberbullying*, Pew Research Center (Sept. 27, 2018), available at https://www.pewresearch.org/internet/2018/09/27/a-majority-of-teens-have-experienced-some-form-of-cyberbullying/.
[23] *Protecting Youth Mental Health, The U.S. Surgeon General's Advisory*, 2021, available at https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.
[24] Emily A .Vogels, *Teens and Cyberbullying 2022*, Pew Research Center (December 15,  2022), available at https://www.pewresearch.org/internet/2022/12/15/teens-and-cyberbullying-2022/.
[25] *See* U.S. Surgeon General's Youth Mental Health Advisory at 8.
[26] Kira E. Riehms, Kenneth A. Feder, Kayla N. Tormohlen, *Associations Between Time  Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth,* JAMA Psychiatry (Sept. 11, 2019), available at https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2749480.a.
[27] Jacqueline Nesi, Mitchell Prinsetin, *Using Social Media for Social Comparison and*

### D.     Plaintiff Has Been Impacted By Defendants' Conduct

149.    The impact Defendants' platforms have had on adolescent and teenage users including Plaintiff's students cannot be overstated. School districts across the country are left dealing with the fallout of Defendants' actions. Increasingly schools are relied on to act as "first responders amid the rising rates of suicidal ideation, overdoses, and gun violence." [28]

150.    The vast majority of schools provide some form of mental health services to students, and over two-thirds of surveyed schools report an increase is services being sought since 2020.[29] Almost half the surveyed schools did not believe they could effectively respond to the demand for mental health services. Common reasons listed for their inability to effectively respond include insufficient staff, inadequate access to mental health professionals, and lack of funding."[30]

151.    Schools now struggle not only with adequately addressing the mental health of students but also with continuing to provide an adequate education because of the strain on resources caused by the mental health crisis. Some of the most common symptoms of excessive social media use include increased anxiety, stress, and depression. Students have identified these issues as being the most significant barriers to learning.[31]

---

*Feed-Seeking:  Gender and Popularity Moderate Associations with Depressive Symptoms,* 43 J. Abnorm. Child Psychol. 8, at 1427-1438 (Nov 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5985443/.
[28] Sabrina Moreno, *The Funding Cliff for Student Mental Health,* Axios (Feb. 2, 2023),  available at https://www.axios.com/2023/02/02/funding-cliff-student-mental-health.
[29] *Results from the April 2022 School Pulse Panel,* U.S. Dep't of Ed., Institute of Education Services, available at https://ies.ed.gov/schoolsurvey/spp/SPP_April_Infographic_Mental_Health_and_Well_Being.pdf. *See also, https://ies.ed.gov/schoolsurvey/spp/* (2022 School Pulse Panel").
[30] *Id.*
[31] Insights From the Student Experience, Part I: Emotional and Mental Health at 2–3,  YouthTruth (2022), https://youthtruthsurvey.org/wp-content/uploads/2022/10/YouthTruth_EMH_102622.pdf.

Middle and high school students also report getting insufficient sleep on school nights which also contributes to underperforming in the classroom.[32] Lack of sufficient quality sleep is also associated with excessive social media usage.

152.    The mental health crisis facing America's youth has caused a myriad of behavioral issues in students which interfere with the schools' ability to teach. In 2022 schools across the country reported increases in disruptions as compared to prior years.[33] These disruptive behaviors included tardiness, skipping class, bullying, fighting, and unauthorized usage of electronic devices among others.[34]

153.    In addition to in school disturbances, schools report an increase in truancy as compared to years before the Covid-19 pandemic.[35] Further, schools have also seen an increase in student vandalism.[36]

154.    School districts have had to bear increased expenses to address the mental health crisis facing their students. Those costs include but are not limited to hiring additional staff specifically to address the mental health of students[37], developing or expanding mental health resources for students[38], additional mental health training for staff and teachers[39], increased costs associated with disciplining students for social media based behaviors, repairing and replacing facilities damaged by students acting out as a result of problems caused by Defendants' platforms and conduct, updating student

---

[32] Anne G. Wheaton *et al.*, *Short Sleep Duration Among Middle School and High School Students-United States, 2015*, 67(3) Morbidity & Mortality Wkly. Rpt. 85–90 (Jan. 26, 2018), http://dx.doi.org/10.15585/mmwr.mm6703a1.
[33] 2022 School Pulse Panel.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*

handbooks and codes of conduct as related to the use of Defendants' platforms.

155. Like many schools across the nation Plaintiff has been directly harmed by the mental health crisis facing its students.

156. In order to respond to the mental, emotional, and social health of its students, Plaintiff has had to divert and expend resources intended for other uses.

157. Despite these actions, Plaintiff is unable to meet the increased need of its students for mental health services.

158. To adequately address the nuisance created and or exacerbated by Defendants, Plaintiff requires substantial, lasting funding.

## VII.   CLAIM FOR RELIEF

### COUNT ONE — PUBLIC NUISANCE

159. Plaintiff repeats, reasserts, and incorporates the allegations contained above as if fully set forth herein.

160. A public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal.

161. A public nuisance constitutes an unreasonable interference with a right common to the general public, such as a condition dangerous to health, offensive to community moral standards, or unlawfully obstructing the public in the free use of public property.

162. Through design and operational choices which prioritize profit at the expense of the user's wellbeing and targeting marketing at adolescent and teen users for financial gain, Defendants have engaged in conduct which endangers the health and safety of the students of the Plaintiff.

163.     All named Defendants have created or perpetuated an environment which is potentially harmful to the health and wellbeing of Plaintiff and its students, while also interfering with the comfortable enjoyment of life and property of entire communities and/or neighborhoods.

164.     Defendants have caused an increase in mental health issues, disrupted the public peace, and negatively impacted the operation of schools, classrooms, and the overall learning environment. Defendants have caused and continues to cause significant lasting damage to Plaintiff and Plaintiff's students.

165.     The continued health and safety of Plaintiff's students, whether past, current, or future users of Defendants' various social media platforms, as well as the health and safety of students affected by those users are matters of substantial public interest and of legitimate concern to Plaintiff.

166.     There is little if any serious doubt that but for Defendants' actions the mental health crisis facing America's youth would be significantly reduced, and millions of adolescents and teenagers would have avoided significant mental health issues.

167.     Logic, common sense, justice, policy, and precedent indicate Defendants' unfair and deceptive conduct has caused the damage and harm complained of herein. Defendants knew or should have known that their *laissez faire* attitude towards the risks and benefits associated with using their platforms was causing harm. Accordingly, the public nuisance and the financial and economic losses incurred by Plaintiff were reasonably foreseeable.

168.     At the very least the conduct of Defendants has been a substantial factor in the mental health crisis facing America's youth as well as the crisis schools are facing to

address it.

169. Defendants' conduct in creating and maintaining the public nuisance was neither fully regulated nor required by any federal or North Caroina law.

170. The public nuisance alleged herein can be abated and further recurrence of such harm and inconvenience can be abated.

171. Plaintiff has been, and continues to be, directly and proximately injured by Defendants' actions in creating a public nuisance.

172. Plaintiff suffered special injuries distinguishable from those suffered by the general public.

173. Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions, like Plaintiff.

## COUNT TWO - NEGLIGENCE

174. Plaintiff repeats, reasserts, and incorporates the allegations contained above as if fully set forth herein.

175. Defendants owed a duty of care to Plaintiff, in part because Defendant knew or foreseeably should have known the design, marketing, and operation of their social media platforms would impose significant harm on the on school aged children across the country, which Plaintiff would be left to face.

176. Defendants have, and continue to, breach their duties of care owed to Plaintiff by way of their intentional wrongdoing in planning, designing, operating, maintaining, and marketing their social media platforms among others.

177. Defendants either knew or reasonably should have known of the

significant peril their social media platforms, particularly the purposefully addictive features intended to maximize user engagement and time spent on the respective platforms could foreseeably lead to a myriad of significant negative mental health and social effects. Such effects include but are not limited to exposure to predators, self-harm, negative body image, partaking in risky behaviors, social and emotional isolation, body dysmorphia, depression, anxiety, eating disorders, suicidal ideation, suicide, and death.

178. Defendants knew or reasonably should have known their operation of their respective social media platforms violated their duty of care to Plaintiff and its students by failing to supply truthful and honest information regarding the risks associated with their social media platforms, and or providing adequate warnings about known possible adverse side effects of using their social media platforms.

179. Each Defendant knew, or in the exercise of reasonable care, should have known that their conduct could be remedied and abated.

180. Defendants unreasonable and negligent conduct is a direct and proximate cause of harms already suffered by Plaintiff as well as harm Plaintiff will continue to suffer. Plaintiff is entitled to damages in amount to be determined at trial.

181. Defendants knowingly decided not to warn or accurately inform Plaintiff, Plaintiff's students, or the general public of the risks associated with their social media platforms despite possessing mounting evidence of the real and serious harms they were causing.

## VIII.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.  That acts alleged above be adjudged and decreed to have created, or were a substantial factor in creating, a public nuisance;

B.  A judgment against Defendants for the damages sustained by Plaintiff, and for any additional damages, penalties, and other monetary relief provided by applicable law;

C.  An order providing injunctive and other equitable relief as necessary to protect the interests of Plaintiff and its students;

D.  By awarding Plaintiff prejudgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after service of this Complaint;

E.  The costs of this suit, including reasonable attorney fees; and

F.  Such other and further relief as the Court deems just and proper.

## IX.  <u>JURY TRIAL DEMANDED</u>

Plaintiff requests a jury trial, under Federal Rule of Civil Procedure 38, on all claims so triable.

DATED: May 7, 2024                    Respectfully submitted,

*/s/ Frank F. Voler*_____
Frank F. Voler (NC Bar No. 17633)
Marc J. Bern (*Notice of Special Appearance pending*)
Marc J. Bern & Partners, LLP
101 West Elm Street, Suite 520
Conshohocken, PA 19428
T: (610) 234-0160
F: (610) 941-9880
fvoler@bernllp.com
mbern@bernllp.com

Conrad Boyd Sturges, III (NC Bar No. 22342)
Davis & Sturges, Attorneys at Law
101 Church Street
P.O. Box 708
Louisburg, MC  27549
T: (919) 496-2137
F: (919) 496-6291
bsturges@dstattys.com

*Attorneys for Plaintiff Franklin County Board of Education*